C SDNY
CUMENT
ECTRONICALLY FILED
C #:
TE FILED: 3/20/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH J. HINCHEY,

                                        Plaintiff,

        -against-

FIRST UNUM LIFE INSURANCE COMPANY
and MANHATTANVILLE COLLEGE,

                                        Defendants.

17-cv-08034 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Joseph J. Hinchey ("Plaintiff") brings this action against First Unum Life

Insurance Company ("First Unum") and Manhattanville College ("Manhattanville") (collectively,

"Defendants"), asserting claims under the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. §§ 1001, *et seq.* (ECF No. 5.) Plaintiff's claims arise from First Unum's denial of long-

term disability benefits ("LTD Benefits") to which Plaintiff was purportedly entitled under the

terms of an employee benefit plan issued to him through his employer.

Before the Court are Defendants' Motion for Summary Judgment (ECF No. 46) and

Plaintiff's Cross-Motion for Summary Judgment (ECF No. 49). For the following reasons,

Defendants' motion is GRANTED, and Plaintiff's cross-motion is DENIED.

## BACKGROUND

The following facts are drawn from the administrative record and the parties' Rule 56.1

statements[1] and are not in dispute unless otherwise noted.

---

[1] Defendants have requested that the Court deem Defendants' Rule 56.1 Statement of Undisputed Material Facts (ECF No. 47 ("Defs. 56.1")) admitted for purposes of this motion under Local Civil Rule 56.1(c). (Defs. Opp. to Pl. Cross Mot. for Summ. J. and in Further Support of Defs. Mot. for Summ. J. ("Defs. Reply"), ECF No. 53, at 3.) Defendants maintain that Plaintiff has not contested any of the undisputed facts in Defendants' Rule 56.1 Statement as required under Local Rule 56.1(b). The Court agrees. When filing his cross motion, Plaintiff included his own Rule 56.1 Statement of Undisputed Material Facts (ECF No. 50 ("Pl. 56.1")) to which Defendants responded in opposing Plaintiff's cross motion (*see* Defs. Response to Pl. 56.1

## A. The Plan and Its Relevant Definitions

The Manhattanville College Employee Benefit Plan (the "Plan"), established and administered by Manhattanville, provides disability benefits to covered employees pursuant to the terms of Group Policy Number 906667 002 (the "Policy"). (Defs. 56.1 ⁋ 1; Pl. 56.1 ⁋ 1; AR[2] 67-110.) The Policy is issued by First Unum. (*Id.*) The Plan confers to First Unum discretionary authority to administer the Policy, stating that "[w]hen making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and the provisions of the policy." (Defs. 56.1 ⁋ 2; Pl. 56.1 ⁋ 2; AR 78.)

The Plan contains various definitions relevant to the parties' respective motions. Under the Plan, a claimant is disabled when:

> [he or she is] limited from performing the **material and substantial duties** of [his or her] **regular occupation** due to [his or her] **sickness** or **injury**; and [he or she] [has] a 20% or more loss in [his or her] **indexed monthly earnings** due to the same sickness or injury.

(Defs. 56.1 ⁋ 3; Pl. 56.1 ⁋ 3 AR 82 (emphasis in original).) The Plan continues, "After 24 months of payments, [a claimant] is disabled when Unum determines that due to the same sickness or injury, [he or she] is unable to perform the duties of any **gainful occupation** for which [he or she is] reasonably fitted by education, training or experience." (*Id.* (emphasis in original).)

---

("Defs. 56.1 Response"), ECF No. 52). Notably, Plaintiff's Rule 56.1 Statement does not *respond* to Defendants' 56.1 Statement. Because Plaintiff did not comply with Local Rule 56.1(b) by responding to Defendants' Rule 56.1 Statement when opposing their motion, the Court will deem the facts in Defendants' Rule 56.1 Statement supported by evidence in the record to be deemed admitted, pursuant to Local Civil Rule 56.1(c). *See MCI LLC v. Rutgers Cas. Ins. Co.*, No. 06 Civ. 4412(THK), 2007 WL 2325867, at *1 n.4 (S.D.N.Y. Aug. 13, 2017) (deeming statements in plaintiff's Rule 56.1 Statement to be deemed admitted where defendant "did not respond to [p]laintiffs' 56.1 Statement in the manner prescribed by Local Rule 56.1(b), but instead submitted its own 56.1 statement in support of its cross-motion for summary judgment"). Nevertheless, because both parties move for summary judgment on the administrative record, the Court will continue to compare the parties' submissions to the record.

[2]     Citations to "AR" represent citations to the administrative record.

The Plan goes on to define "Gainful Occupation" as "an occupation that is or can be expected to provide you with an income within 12 months of your return to work[] that exceeds 80% of your indexed monthly earnings, if you are working; or 60% of your indexed monthly earnings, if you are not working." (Defs. 56.1 ₽ 4; Pl. 56.1 ₽ 4; AR 97.) The Plan next defines "Limited" as "what you cannot or are unable to do" and "Material and Substantial Duties" as "duties that[] are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." (Defs. 56.1 ₽ 6; Pl. 56.1 ₽ 6; AR 98.) Finally, and critically for this motion, the Plan defines "Regular Occupation" as "the occupation you are routinely performing when your disability begins." (Defs. 56.1 ₽ 7; Pl. 56.1 ₽ 7; AR 100.) When assessing a claimant's regular occupation, "Unum will look at [the] occupation *as it is normally performed in the national economy*, instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.* (emphasis added).)

Under the terms of the Plan, a claimant must submit, at the request of First Unum, "proof of a claim[] provided at [his or her] expense." (Defs. 56.1 ₽ 8; AR 73.) This includes (1) proof that a claimant is "under the regular care of a physician," (2) documentation of "monthly earnings," (3) the date claimant's disability began, and (4) the cause and extent of the disability, "including restrictions and limitations preventing [the claimant] from performing [his or her] regular occupation." (AR 73.) Notably, the Plan explains that First Unum may also request "proof of continuing disability." (Defs. 56.1 ₽ 9; Pl. 56.1 ₽ 8; AR 73.)

## B. Plaintiff's Initial Application for LTD Benefits and First Unum's Review and Approval

On December 8, 2010, following his August 2010 aortic valve replacement, Plaintiff applied for benefits. (Defs. 56.1 ₽ 10; Pl. 56.1 ₽ 9; AR 40, 42.) According to the physician statement by cardiologist Joseph J. Tartaglia, M.D. ("Dr. Tartaglia"), Plaintiff could not "stand or

walk except frequently [sic], not continuously," "climb twist, bend, stoop or reach above shoulder level except occasionally," or "operate heavy machinery." (AR 43.) The application further explained that Plaintiff could not "be in [a] position where he [was] exposed to risks of falls," could not "lift heavy objects," could not do "extreme bouts of heavy exertion," and should be "protected from stressful situations or combative situations at work." (*Id.*)

Plaintiff's application also included a letter from Dr. Tartaglia that mirrored his physician statement. (Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 10; AR 44.) In the letter, Dr. Tartaglia described Plaintiff as a "51-year-old male with a history of recent aortic valve replacement," which included a "porcine valve for severe aortic insufficiency." (AR 44.) Dr. Tartaglia explained that "Plaintiff remain[ed] with paroxysmal atrial fibrillation and significant chest pain and tenderness" and "ha[d] to be on warfarin because [of] the danger of thromboemboli." (*Id.*) Dr. Tartaglia also explained that Plaintiff had "hyperactive airway disease for which he takes Singular and he needs to take beta blockers to control palpitations." (*Id.*) In summation, Dr. Tartaglia reiterated, consistent with his physician statement, that Plaintiff (1) could not "be in a position where he was exposed to risks of falls because of the danger of bleeding on warfarin," (2) could not "lift heavy objects because of his chest wall pain," (3) had a "somewhat limited" exercise capacity because of his heart disease, (4) "should not be requested to do extreme bouts of heavy exertion," and (5) "should be protected from stressful situations or combative situations at work." (*Id.*)

Several weeks later, Plaintiff had an initial phone call with First Unum. (Defs. 56.1 ¶ 13; Pl. 56.1 ¶ 13; AR 124-29.) During the call, Plaintiff told First Unum that he could not "lift anything heavy, could not "jog," was "tired during the day," had shortness of breath when going "up and down [] steps," and had "discomfort in his chest from time to time." (AR 124.) In a typical day,

Plaintiff stated that he "showers and watches TV," "naps on and off all day," and possibly does "a little exercise such as go[ing] for a walk." (Defs. 56.1 ¶ 14; Pl. 56.1 ¶ 14; AR 126.)

Plaintiff was then asked about his job, his job duties, and his job's physical demands. (AR 127.) In response, Plaintiff explained that he "was an EMT," was "in charge of 30 guards and[] 110 acres," had to "keep crowd control," "patrolled the campus," "was the only member [of security] authorized to carry a gun," and "assume[d] all fire/police/emergency activities until authorities arrived." (*Id.*; *see also* Pl. 56.1 ¶ 17.) Plaintiff further explained that he "could be on his feet [f]or 16 hours straight some days or 6 hours another." (*Id.*) Ultimately, as Plaintiff continued, his activities varied: "Sometimes he would have to sprint up and down stairs to dorm rooms, other time he would drive to the necessary scene or walk across campus." (*Id.*) Plaintiff was also clear that he "had to be physically strong enough to restrain people and keep order." (*Id.*)

The next month, on February 16, 2011, Manhattanville provided a job description for its Director of Campus Security position. (Defs. 56.1 ¶ 15; Pl. 56.1 ¶ 15; AR 435.) According to the job description, the Director of Campus Security was "responsible for the day to day operation of the department" and oversaw "security officers, conduct[ed] investigations, stay[ed] current with OSHA regulations, and [saw] that all officers [were] current in training." (AR 433.) Specific responsibilities included, *inter alia*, (1) "[p]rovid[ing] leadership to all conflict solutions[, which] may involve students and/or members of the general public . . . [and] [m]ay involve physical confrontation and coordination of officers to insure maximum resolution of situations"; (2) "[p]rovid[ing] leadership to emergency situations including those that may involve immediate[] physical injury to members of" the Manhattanville community; (3) "[c]oordinating security detail for VIP guests of the College," which could include "identifying as well as confronting individuals who may pose a threat and/or are causing disruption at a campus event";

and (4) "serv[ing] with VP of Student Affairs as [the] main campus contact for all campus emergencies," which required Plaintiff to "coordinate[] all emergency notification and response to the entire campus community." (AR 433.) The description noted that "other duties may be assigned from time to time." (*Id.*)

First Unum next consulted a Vocational Rehabilitation Consultant, Alan Lobel, MHS, CRC ("Lobel"), to determine Plaintiff's regular occupation in the national economy, "including physical demands [of that job] going forward." (AR 465; *see also* Defs. 56.1 ℙ 17; Pl. 56.1 ℙ 18.) Lobel reviewed, among other things, the job description sent by Manhattanville and Plaintiff's own job description. (*See* AR 466-67.) Lobel concluded "with a reasonable degree of vocational certainty" that Plaintiff's occupation as it is performed in the national economy was "most consistent with the eDOT[3] occupation of Director Security[, or Security Director] eDOT 189.117-082." (AR 467; Def. 56.1 ℙ 18; Pl. 56.1 ℙ 19.) Under eDOT, a Security Director "[d]irects the development and implementation of security programs to guard against theft, vandalism, sabotage, violence, or other threats against the client, organization, or its employees." (AR 467.) The occupation required "Light Work: Exerting up to 20 pounds." (AR 470; *see also* Defs. 56.1 ℙ 19; Pl. 56.1 ℙ 20.)

In summarizing his conclusion, Lobel acknowledged Plaintiff's proffered job description:

> [Plaintiff] indicated during his IL/TPC that he . . . was an EMT and the emergency technician as well. [Plaintiff] [is] in charge of 30 guards and 110 acres. [Plaintiff] had to keep crowd control. They patrolled the campus. [Plaintiff] was the only member authorized to carry a gun. They assumed all fire/police/emergency activities until police/fire[] arrived. [Plaintiff] lived 4 miles from campus so he kept the radio on 24-7 in case he was needed. [Plaintiff] could be on his feet [f]or 16 hours straight some days or 6 hours another. The activities varied. Sometimes he would have to sprint up and down stairs to dorm rooms, other times he would drive to the necessary scene or walk across campus. [Plaintiff] had to be physically strong enough to restrain people and keep order.

---

[3]     eDOT stands for the "Dictionary of Occupational Titles," which is "published by the United States Department of Labor." (AR 471.)

(AR 471.)  Lobel then compared Plaintiff's job description with his job in the national economy:

> Security Director is a supervisory position and activities such as crowd control[,] patrolling campus[,] and EMT activities to name three would not necessarily be directly carried out by a Director of Campus Security[;] these activities would be supervised.  They may also be material but not a substantial activity.[4]  The occupation in the national economy does not include actual EMT and Crowd control as material and substantial occupational duties and these could be either employee voluntarily completed or a factor of the job site or employer and not representative of the occupation as performed in the national economy.

(*Id.*; Defs. 56.1 ¶¶ 20-21; Pl. 56.1 ¶ 21.)

On February 18, 2011, First Unum informed Plaintiff, via letter, that it had approved his request for LTD Benefits.  (Defs. 56.1 ¶ 22; Pl. 56.1 ¶ 22; AR 442.)  The letter explained that it had "approved [Plaintiff's] benefits because [he was] unable to do [his] own occupation due to the symptoms related to [his] medical condition of being status post a mitral valve replacement [sic]."  (AR 444.)  The letter also noted that Plaintiff's "benefits [would] continue as long as [he met] the definition of disability in the policy provided by [his] employer and [was] otherwise eligible under the policy terms."  (Defs. 56.1 ¶ 23; AR 444.)  The letter explained that First Unum was continuing its pre-existing condition review, which could impact the "maximum duration of [Plaintiff's] claim.  (AR 444.)  Although the letter reiterated how First Unum defined "regular occupation" under the Policy (*id.* 445), it did not specify that Plaintiff's occupation was "Security Director" under eDOT (Pl. 56.1 ¶ 22).

---

[4]  According to eDOT, the "Material and Substantial Duties" of the Security Director included the following responsibilities: (1) "direct[ing] installation, maintenance, and operation of electric security systems"; (2) "ensur[ing] compliance with Federal, State, and local regulations and standards involving hazardous materials, environmental management, and fire safety"; (3) "assist[ing] with security clearances for new employees or visitors"; (4) "conduct[ing] internal investigations relat[ing] to sensitive security issues"; (5) "inspect[ing] premises to determine security needs, and recommend[ing] protection measures"; (6) "participat[ing] in investigation[s] of crimes, such as fraud, robbery, and arson"; (7) "notify[ing] management of security weaknesses, and implement[ing] procedures for mitigating losses"; (8) "conduct[ing] internal investigations relating to sensitive security issues"; (9) "investigat[ing] acts of vandalism or theft, and work[ing] with law enforcement as necessary"; (10) "prepar[ing] written reports of results of investigations as required"; (11) "remov[ing] unruly individual or detain[ing] them until they can be turned over to proper authorities"; and (12) "testify[ing] in court."  (AR 467-68.)

**C. First Unum's Continued Review of Plaintiff's LTD Benefits Eligibility**

In May 2011, after approving Plaintiff's LTD Benefits, First Unum wrote to Dr. Tartaglia, Karl Kreiger, M.D. ("Dr. Kreiger"), Plaintiff's cardiac surgeon, and Michael Fusco, M.D. ("Dr. Fusco"), Plaintiff's family doctor, to ask whether Plaintiff could perform light work and, if not, whether he had reached "maximum medical improvement." (Defs. 56.1 ¶ 24; Pl. 56.1 ¶ 24; AR 521, 524, 527.) The letter defined "light work" as "exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects." (Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 25; AR 521, 524, 527.) Light work included "frequent walking and sitting, occasional standing, stooping and reaching." (*Id.*)

Both Dr. Fusco and Dr. Tartaglia responded that Plaintiff could not perform full-time light work. (AR 538, 853.) The doctors, however, disagreed as to whether Plaintiff had reached maximum medical improvement. While Dr. Fusco did not believe Plaintiff had reached maximum medical improvement (*id.* 538), Dr. Tartaglia did believe Plaintiff had reached maximum medical improvement (*id.* 853). Meanwhile, Dr. Kreiger declined to respond, explaining, "We usually let the patients['] cardiologist determine return to work." (Defs. 56.1 ¶ 27; Pl. 56.1 ¶ 26; AR 531.)

The following month, on June 14, 2011, First Unum asked Marilyn Young, R.N. ("Nurse Young"), to review Plaintiff's medical information available at the time, including Plaintiff's doctors' responses to First Unum's letters. (Defs. 56.1 ¶ 28; AR 863.) Specifically, First Unum asked Nurse Young to answer the following question: "Does the medical in the file [sic] support that the claimant is unable to perform the duties of lifting up to 20 lbs of force occasionally and/or 10 lbs of force frequently as well as frequent stand/walk and occasional sit?" (AR 864.) Nurse Young concluded that, "based on consistent reports of exercise intolkerance [sic] with [shortness of breath]," Plaintiff's Holter Monitor test results, and the Social Security Disability Insurance's

evaluation, "it [was] medically reasonable that [Plaintiff] would not have predictable sustainable [sic] functional capacity" to perform light work. (*Id.*) Nurse Young further reported: "We are almost a year post operatively; Cardiologist has opined [maximum medical improvement]; therefore [it is] reasonable that [Plaintiff] will not return to premorbid functional capacity." (Defs. 56.1 ¶ 29; AR 864.) Nurse Young recommended follow up in 18 to 24 months. (AR 864.)

Shortly after, on June 23, 2011, First Unum informed Plaintiff that it was continuing to evaluate Plaintiff's eligibility for LTD Benefits. (Defs. 56.1 ¶ 30; Pl. 56.1 ¶ 28; AR 876.) First Unum reiterated that, after 24 months of payment, it would consider Plaintiff disabled if he was "unable to perform the duties of any gainful occupation for which [he was] reasonably fitted by education, training or experience." (AR 876.) First Unum then advised Plaintiff:

> You began receiving benefits on February 14, 2011. As of February 14, 2013 you will have received 24 months of benefits. At that time, the definition of disability will require that you be disabled from performing the duties of any gainful occupation. Based on the current information we have about our Long Term Disability claim, medical and financial updates will now be requested less often. The frequency of future contact and updates will depend on the details of your claim. . . .

(Defs. 56.1 ¶ 30; Pl. 56.1 ¶ 28; AR 877.)

A year later, on July 25, 2012, First Unum called Plaintiff to "obtain a thorough update on [his] conditions, providers, and daily activities." (AR 919.) Plaintiff reported that he "still ha[d] chest pain" and "shortness of breath and dizziness."[5] (*Id.*) Plaintiff also reported that he "used the treadmill/elliptical, some days [going] longer than others, max is a mile, sometimes [only going] for 10 minutes," but advised that he could never jog. (Defs. 56.1 ¶ 31; Pl. 56.1 ¶ 30; AR 919.)

---

[5]     This information was also noted in First Unum employee Johanna Mueller's notes, dated July 25, 2012, regarding her Annual Review of Plaintiff's LTD Benefits. (AR 921 ("[Employee] advises that he still has chest pain, he doesn't always know what causes it, but he adv[ises] sometimes changes in weather, climbing up steps, or walking too much/up a hill will causes it. [Employee] also gets shortness of breath and dizziness. [Employee] adv[ises] that he is chronically tired, he adv[ises] that the Coumadin has made him hemophilic, so he needs to be very careful about getting cuts.").) Mueller noted that a Financial Settlement Unit ("FSU") review was feasible "per FSU Tool" but concluded that no further action was required. (*Id.*)

Plaintiff then noted that he could not lift anything,[6] "occasionally trie[d] to do rehab work at the gym, read[] the news, [hung] around the house, [took] naps during the day, [and] use[d] the computer," "ha[d] a gardener because he [could not] cut the grass anymore," and had his spouse do all household chores.  (AR 919-20; *see also* Defs. 56.1 ⁋ 31; Pl. 56.1 ⁋ 30.)

The following year, on July 24, 2013, First Unum requested that Plaintiff complete a "Disability Status Update form" to assist the company in its "continued evaluation of [his] claim." (Pl. 56.1 ⁋ 32; AR 963.)  Plaintiff completed the attached form and submitted it to First Unum on August 19, 2013.  (AR 963.)  Thereafter, on or around September 6, 2013, First Unum called Plaintiff to discuss his current condition.  (Defs. 56.1 ⁋ 32; Pl. 56.1 ⁋ 33; AR 983.)  During the call, First Unum employee Nils Ferm reported that Plaintiff

> [h]as SOB and palpitations with any exertion or sometimes at night while asleep[,] [h]as been encouraged to take short walks of half a mile to a mile but will need to sleep for at least an hour after returning from the walk to rest[,] [w]ill nap at least once per day regardless of activity due to fatigue and usually two times per day[,] [h]as chest pains if tries to lift more than 10 or so pounds . . . .

(AR 983.)  Ferm later recommended that Plaintiff's claim remain in annual monitoring.  (*Id.* 986.)

First Unum again spoke with Plaintiff on September 8, 2014 for another update on his condition.  (Defs. 56.1 ⁋ 33; Pl. 56.1 ⁋ 36; AR 999-1000.)  Plaintiff again reported suffering from chest pain, fatigue, and shortness of breath, and noted that he could not "stand or walk frequently, climb, twist, bend, stoop, operate heavy machinery or reach above shoulder level."  (Pl. 56.1 ⁋ 36; AR 999.)  When asked about his current daily activities, Plaintiff explained that he "[t]ries not to fall often[,] . . . [t]ries to help [his] spouse out when he can[,] [h]as to watch what he does[,] [g]ets tired easily[, and] . . . [c]an get up for an hour or so-take a walk [but] [o]nce he is done he gets tired."  (Defs. 56.1 ⁋ 33; Pl. 56.1 ⁋ 35; AR 1000.)  Although "Doctors [told] him he need[ed] to

---

[6]    Plaintiff clarified that when doing physical therapy, he could lift only 30 pounds using a machine and could not lift free or dead weights.  (AR 919-20.)  If lifting too much weight, he felt it in his chest.  (*Id.* 920.)

try to exercise and get up" because he "need[ed] to loose [sic] 10 pounds," Plaintiff explained that exercise exhausted him. (*Id.*)

Based on this conversation, First Unum concluded that "[d]ue to [Plaintiff's] condition [Plaintiff] would not have [the] capacity to sustain a gainful occupation on a predictable basis." (*Id.* 1003.) First Unum again determined that Plaintiff's claim should "[r]emain in core for annual monitoring, next steps for updated medical set for 2[0]15." (Pl. 56.1 ¶ 36; AR 1003.) The company also decided that, although referral to FSU was "feasible per tool tier-3," it was "not medically feasible at this time due to [Plaintiff's diagnosis]." (*Id.*)

## D. First Unum Refers Plaintiff's Claim to Its Financial Settlement Unit

On September 8, 2015, First Unum initiated its annual review of Plaintiff's LTD Benefits claim. (Pl. 56.1 ¶ 37; AR 1014.) The annual review concluded on October 5, 2018, determining

> [b]ased on review of available medical information the insured has not made any significant improvement to his medical condition. [Employee] continues to report chest pains, shortness of breath[,] memory problems and fatigue. Occasionally [Employee] will experience dizzy spells which results in falls; last fall resulted in a severe ankle sprain and 3 months of PT. [Employee] reports shortness of breath even at rest. [Employee] tires easily and requires a nap daily. [Employee's] spouse does the household chores and running errands. [Employee] states he would be unable to stand on his feet or work long hours. Due to [Employee's] condition [Employee] would not have capacity to sustain a gainful occupation on a predictable basis.

(AR. 1033.) First Unum again determined that Plaintiff's LTD Benefit claim should "[r]emain in core for annual monitoring" and referral to FSU was again not medically feasible at the time. (Pl. 56.1 ¶ 40; AR 1033.)

A few weeks later, despite its earlier determination, First Unum opened an inquiry about whether Plaintiff's claim was suitable for settlement. (Defs. 56.1 ¶ 34.) This inquiry involved evaluating Plaintiff's life expectancy (*i.e.*, a mortality review), conducting a database search of

Plaintiff,[7] and calculating the present value of potential future benefits to Plaintiff. (Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 41; AR 1035, 1037-69, 1070-71.) On October 27, 2015, First Unum determined that a "PreX eval [pre-existing condition evaluation]" should be completed to assess the maximum duration of Plaintiff's LTD Benefits.[8] (AR 1072.) As the note then explained, once the "preX eval" was complete, Plaintiff's file could then be "referred directly back to FSU." (AR 1073.)

To "complete [Plaintiff's] pre-x eval," First Unum's Disability Benefits Specialist group ("DBS") opened a "New Claim Review" for "Special Benefits" on November 3, 2015. (Pl. 56.1 ¶ 42; AR 1078.) The purpose was to review "information available/obtained for the pre-ex look back period of 10/1/09-12/31/09, to clarify [Plaintiff's] max duration date." (AR 1080.) In essence, the reviewers sought to answer the following question: "Do the medical records and information for review in the file show that [Plaintiff] received medical treatment, consultation or care of services related to his disabeling [sic] condition during the look back period of 10/1/09-12/31/09?" (*Id.*)

As part of this review, Margaret Sones, R.N., evaluated Plaintiff's file on November 16, 2015. (*Id.* 1084.) Her review concluded the following:

> The records in [Plaintiff's] file consistently reflected a long [history] of an aortic valve condition with heart murmur and cardiology evaluation back to 1995. Cardiology OVNs [office visit notes] and an echocardiogram just prior to the start of the above look back time period [of 10/1/09-12/31/09] clearly documented [diagnosis] of aortic stenosis/aortic valve insufficiency, moderate to severe, that would continue to be monitored as there was no indication the insured needed heart valve replacement yet. . . .
>
> Records in file have also noted the insured has had some anxiety and depression, but there was nothing in the above time look back time period documenting medical

---

[7] This 31-page report disclosed various records related to Plaintiff, including employer information, residential information, utilities information, property deeds, bankruptcy records, voter registrations, and possible relatives. (AR 1037.)

[8] The notes of Johnathan Dyer provide more color as to why a pre-existing condition evaluation was necessary. As the notes explain, the maximum duration of the Policy was to age 65 under the "prior policy" but under the "Unum policy" the maximum duration was to "age 66&10 months." (AR 1074.) "If [the] max duration [was] modified to age 65," then First Unum had to wait one more month for "FSU Referral." (*Id.*)

> treatment, consultation, care or services . . . related to the BH condition, and records did not reflect this as impairing when he went OOW on DOD for heart valve replacement.

(*Id.* 1085-86.)  Following this review, on November 24, 2015, DBS undertook an "additional review to determine if [Plaintiff] is TD [totally disabled] and without likely change in capacity through policy max" (*id.* 1087), which Defendants describe as "[o]ne of the last parts of the evaluation for the feasibility of financial settlement (Defs. 56.1 ‖ 36).  This additional review entailed "a detailed call with [Plaintiff] re: his current ADLs, current status, and to confirm all recent treating providers," a "VRC skills comment," and a "records request to the AP [who] completed the APS (Tartaglia) and to any other APs identified."  (AR 1087.)

## E.  First Unum Reviews Updated Medical Records from Plaintiff's Attending Physicians

On November 30, 2015, First Unum contacted Plaintiff to inform him that it had "reviewed and evaluated in detail [his] policy provisions," in turn concluding that he would "remain eligible for max duration to the longer of the two plans (Unum plan) to age 66 and 10 months." (*Id.* 1089.) First Unum also confirmed that Plaintiff had not experienced any change in his reported symptoms of "Chest pain, Fatigue, SOB and Trouble with memory and concentration." (*Id.*)  At the conclusion of the call, First Unum advised Plaintiff that it would "be obtaining updated records and disability opinion[s] from [his] doctors for a recertification review."  (*Id.* 1090.)

The next day, on December 1, 2015, DBS consulted with vocational representative Carrie Gregor to "comment on the insured's skills to alternate less physically demanding occupations." (*Id.* 1093.)  Gregor "reviewed the file post 11/16/2015 forum discussion" and determined that Plaintiff—whose occupation was "consistent with Security/Security Director and performed within the Light physical demand range"—"would likely have skills to alternate Sedentary occupations," but those occupations "would not yield a gainful wage, currently calculated at $28.00 / hour." (*Id.*)

That same day, however, First Unum requested that Dr. Fusco and Dr. Tartaglia provide updated records from July 1, 2014 to present. (Defs. 56.1 ⁋ 37; Pl. 56.1 ⁋ 43.) First Unum also requested that the doctors clarify Plaintiff's "work capacity within the following occupational demands: Exerting up to 20 pounds of force; Occasional: lift/carry 10 to <20 pounds, push/pull, stand, sit/stand option, stoop, reach, reach upward, handle, finger, feel, keyboard use, exposure to injury from biohazards, and exposure to weather; and Frequent: lift/carry less than 10 pounds, sit, walk, adaption to change and travel." (Pl. 56.1 ⁋⁋ 47, 51; AR 1096; 1209.) Based on this information, First Unum asked for an answer the following question: "Is [Plaintiff] able to perform the above occupational demands on a full-time (40 hours per week) basis?" (AR 1096, 1209.)

On or about December 11, 2015, Dr. Fusco responded to First Unum's work-capacity question. (Pl. 56.1 ⁋ 47; AR 1112.) Dr. Fusco indicated that Plaintiff could not perform the [] occupational demands [detailed in the letter] on a full-time (40 hours per week) basis." (Pl. 56.1 ⁋ 47; AR 1112.) Dr. Fusco cited the following reasons for his answer: "aortic stenosis[;] aortic valve replacement[;] dyspnea on exertions[; and] decreased ejection fraction." (*Id.*) In a follow-up correspondence, faxed on December 14, 2011, Dr. Fusco added that Plaintiff was "unable to work do [sic] to cardiac condition." (Pl. 56.1 ⁋ 47; AR 1115.)

A few days later, on December 18, 2015, Dr. Tartaglia provided the requested medical records. (Defs. 56.1 ⁋ 40; Pl. 56.1 ⁋ 44; AR 1126.) Notably, those records included physician notes from Plaintiff's October 15, 2014 office visit to Dr. Tartaglia. (AR 1128-30.) During that visit, Plaintiff reported that he "perform[ed] regular exercise[,] . . . work[ed] out[, and] . . . [went] to the gym, daily 45min." (*Id.* 1128.) Plaintiff also reported complaints of "palpitations in the chest, without chest pains, without diaphoresis or dyspnea, without syncope," and that the frequency of the palpitations were "occasional[]." (*Id.*) Plaintiff further denied "Pedal Edema[,]

Shortness of breath[,] Dizziness/giddiness[, and] Syncope/Collapse." (*Id.*) Dr. Tartaglia then observed, among other things, that Plaintiff's cardiovascular system had a "normal S1S2, regular rate and rhythm, 3/6 systolic murmur at the base of the heart."[9] (*Id.* 1129.) Dr. Tartaglia concluded by ordering a stress test exercise for Plaintiff. (Defs. 56.1 ❡ 40; Pl. 56.1 ❡ 45; AR 1129.)

The stress test was performed on October 21, 2014. (Defs. 56.1 ❡ 41; Pl. 56.1 ❡ 46; AR 1131.) Plaintiff completed the entire test in 10 minutes and 30 seconds, had a maximum heart rate of 147, and reached a peak METS[10] of 12.5. (Defs. 56.1 ❡ 41; Pl. 56.1 ❡ 46; AR 1133.) Dr. Tartaglia observed that the stress test "was negative for signs or symptoms of coronary disease. (AR 1131.) Dr. Tartaglia explained, however, that "[t]here were PVCs noted and a couplet," which "indicate[d] a high ten-year risk of coronary artery disease." (*Id.*)

According to these records, Plaintiff visited Dr. Tartaglia two other times—on April 22, 2015 and October 5, 2015. (*Id.* 1145, 1149.) On April 22, 2015, Plaintiff complained of "dyspnea at rest, no wheezing," although the stress test was normal. (*Id.* 1145.) Dr. Tartaglia noted the "tightness [was] probably related to the chest wall wound since it's been going on since the surgery." (*Id.*) During the October 5, 2015 visit, Plaintiff complained of an issue unrelated to his aortic valve disease. (*Id.* 1149.) For both visits, Dr. Tartaglia reported that Plaintiff was regularly exercising and going to the gym daily for 45 minutes. (*Id.* 1145, 1149.) Both times, Plaintiff also denied "Chest Pain[,] Palpitations, Dizziness/Giddiness[, and] Syncope/Collapse."[11] (*Id.* 1145, 1149.)

---

[9] The same was reported during Plaintiff's April 22, 2015, October 5, 2015, and December 16, 2015 office visits. (AR 1145, 1150, 1225.)

[10] METS stands for Metabolic Equivalents. Defendants explain that they are a "measure of physical activity levels." (Defs. Mem. of Law in Supp. of Mot. for Summ. J. ("Defs. Mot."), ECF No. 48, at 2 n.1 (citing Mouaz H. Al-Mallah *et al.*, Sex Differences in Cardiorespiratory Fitness and All-Cause Mortality, 91(6) Mayo Clinic Proceedings 755 (2016), *available at* https://www.researchgate.net/publication/3025533 72_Sex_Differences_in_Cardiorespiratory_Fitness_and_All-Cause_Mortality.)

[11] Plaintiff also denied shortness of breath during his October 5, 2015 visit. (AR 1149.)

On January 11, 2016, First Unum asked Deborah Ainscough, R.N. ("Nurse Ainscough") to review Plaintiff's "updated medical records for assessment of [his] functional capacity." (Defs. 56.1 ⁋ 43; Pl. 56.1 ⁋ 48; AR 1191.) Upon her review of Plaintiff's medical records, Nurse Ainscough reported that "[i]t [was] unclear as to why [Plaintiff] continue[d] to report dyspnea on exertion, palpations and fatigue while the exam finds and diagnostic testing demonstrate[d] that on a 4/21/2014[12] stress test he was able to reach 12.5 mets and has normal EKG." (Defs. 56.1 ⁋ 44; Pl. 56.1 ⁋ 49; AR 1194.) Nurse Ainscough further reported "[Plaintiff's] stress test of 10/21/2014 and ECG [was] normal with no evidence of ischemia or CA," such that it was "unclear as to what [was] causing the physical symptoms [Plaintiff was] describing as there are no diagnostic or exam findings to correlate to this level of functional capacity."[13] (AR 1194.) Nurse Ainscough concluded that the "medical records reveal[ed] findings that [were] inconsistent with [Plaintiff's] reported symptoms." (*Id.*) As to next steps, Nurse Ainscough determined that First Unum should "[o]btain recent Echocardiogram or other diagnostic tests if available."[14] (*Id.*)

On February 16, 2016, Dr. Tartaglia responded to First Unum's "work capacity" questions. (Pl. 56.1 ⁋ 51; AR 1209.) Like Dr. Fusco, Dr. Tartaglia explained that Plaintiff could not "perform the [] occupational demands [listed in the letter] on a full-time (40 hours per week) basis." (AR 1209.) Dr. Tartaglia then observed that Plaintiff had "Paroxysmal Atrial Fibrillation" and could not "lift heavy weights due to chest wall pain," "run," or engage in "heavy exertion." (*Id.*)

---

[12]    This appears to be a reference to the October 21, 2014 stress test.

[13]    Nurse Ainscough also noted the discrepancy between Plaintiff reporting that "he limits activities to watching TV and us[ing] internet around the house" and his medical records indicating that he "go[es] to the gym to exercise 45 minutes everyday." (AR 1194.)

[14]    Nurse Ainscough stated it would "be good to have a recent echocardiogram or cardiac function testing if available to discern [Plaintiff's] current cardiac pump function." (AR 1194.) She reasoned Plaintiff's "2012 echocardiogram show[ed] his ejection fraction to be 50-53% with 50-70% the normal range of cardiac functions." (*Id.*) In February 23, 2016, however, Jonathan Dyer explained, though Nurse Ainscough "recommended obtaining updated diagnostics," "additional diagnostics ha[d] since been received." (*Id.* 1239.)

He further noted that Plaintiff got "frequent palpitations with exertion," fatigued if "standing for long periods of time," and could not "stand[] longer than 30 minutes." (*Id.*)

That same day, in response to a January 19, 2016 letter request from First Unum, Dr. Tartaglia faxed the results of Plaintiff's Holter Monitor test, dated January 5, 2016.[15] (Defs. 56.1 ¶ 46; Pl. 56.1 ¶ 52; AR 1213.) According to the results, Plaintiff was "monitored for a period of 24 hours," and, during that period, there were a "total of 104388 [heart] beats with an AVG RATE of 72." (AR 1218.) Plaintiff's maximum heartrate reached 156 beats per minute. (*Id.*) Dr. Tartaglia noted the following "Commentary/Impressions":

> The rhythm was predominantly sinus rhythm. There were occasional narrow runs up to 13 beats at a rate of 150 beats per minute. The patient did not report symptoms during the monitoring period. There was normal heart rate variability 56 ms. There were no significant st segment depressions. There were no significant pauses greater than 2 seconds. There were frequent wide beats noted up to 151 per hour. . . . There were no wide runs noted.

(*Id.*)

Shortly after receiving this information, First Unum requested that Catriona Shepherd, M.D. ("Dr. Shepherd"), a board-certified physician in family medicine, speak with Dr. Tartaglia and Dr. Fusco. (Defs. 56.1 ¶ 48; Pl. 56.1 ¶ 53; AR 1240.) First Unum enlisted Dr. Shepherd because the "CC [clinical consultant] review . . . did not support impairment from [light physical occupational] demands" and "updated testing [did] not appear consistent with the severity of [Plaintiff's] reported symptoms." (AR 1240.)

Dr. Shepherd spoke with Dr. Tartaglia on February 24, 2016 and wrote him a letter the next day to summarize their discussion. (Defs. 56.1 ¶ 49; Pl. 56.1 ¶ 55; AR 1260.) Dr. Shepherd noted

---

[15] The Holter monitor test was ordered during Plaintiff's December 16, 2015 visit with Dr. Tartaglia. (AR 1125-26.) The physician notes for that visit reflect that Plaintiff had complained of "palpitations in the chest, like fluttering, occasionally, several times a month[], last[ing] less than a minute, without diaphoresis or dyspnea, without syncope, without chest pains." (*Id.* 1225.) Plaintiff during the visit again denied "chest pain, pedal edema, shortness of breath[,] dizziness/giddiness[,] syncope/collapse[,] anorexia." (*Id.*)

that Dr. Tartaglia (1) "believe[d] [Plaintiff] could perform sedentary work" and (2) "stated that although [Plaintiff's] stress test demonstrate[d] functional capacity [he] [had] concerns that it [was] 2 years old" and may need to be repeated. (AR 1260) Dr. Shepherd further summarized that Dr. Tartaglia did not agree that Plaintiff was capable of performing the following occupational demands on a full time basis: "Exerting up to 20 pounds of force; Occasional: lift/carry 10 to <20 pounds, push/pull, stand, sit/stand option, stoop, reach, reach upward, handle, finger, feel, keyboard use, exposure to injury from biohazards, and exposure to weather; Frequent: lift/carry less than 10 pounds, sit, walk, adaption to change and travel." (*Id.*)

Dr. Shephard was unable to reach Dr. Fusco, so she wrote to him on February 24, 2016.[16] (Defs. 56.1 ¶ 51; Pl. 56.1 ¶ 56; AR 1272.) In addition to inquiring about whether Plaintiff's condition precluded him from certain occupational demands, the letter also summarized the findings from Plaintiff's October 2014 stress test and January 2016 Holter Monitor test. (AR 1272.) On March 10, 2016 Dr. Fusco answered "No" to the question of whether he "agree[d] that [Plaintiff] is capable of performing described occupational demands [detailed in the letter] [on] a full-time basis." (*Id.* 1273.) Dr. Fusco explained, "Due to [Plaintiff's] prior medical condition; cardiac surgery needed to replace his aortic valve; I feel he is not suitable to return to work. I believe returning to work jeopardizes his cardiac condition. He may not require [sic] both the physical and emotional[17] conditions that he was required to perform." (*Id.*)

---

[16]     While Dr. Shepherd contacted Plaintiff's attending physicians, First Unum's Disability Benefits Specialist, Donald Beaudette, spoke with Plaintiff on February 25, 2016. (Defs. 56.1 ¶ 53; Pl. 56.1 ¶ 57; AR 1263-64.) After being advised of the disagreement with Plaintiff's attending physicians' assessment of Plaintiff's condition, Plaintiff "voiced his concern with putting himself and others in a jeopardizing position and risking his own and the safety of others." (AR 1263.) Plaintiff again reported "fatigue, SOB w/exertion, inability to climb stairs, etc." (*Id.*) Plaintiff also noted that he felt he would "need another valve replacement in the future, [and] has had PT on and off and has tried to do what he has been told in order to try to continue living and to have a future with a reasonable quality of life." (*Id.*)

[17]     Plaintiff listed the quote as "physical and exertional conditions" (Pl. 56.1 ¶ 56), but the Court agrees that it appears that Dr. Fusco wrote "physical and emotional" (*see* Defs. 56.1 Response at 18).

Eventually, on March 16, 2016, Dr. Shepherd conducted a peer review for First Unum. (Defs. 56.1 ⁋ 54; Pl. 56.1 ⁋ 58; AR 1280-84.) First Unum had asked Dr. Shepherd to answer the following question: "Do the medical records and information available for review preclude the insured from performing the following on a full-time basis?" (AR 1280.) First Unum further requested that Dr. Shepherd consider the following occupational demands: "Exerting up to 20 pounds of force; Occasional: lift/carry 10 to <20 pounds, push/pull, stand, sit/stand option, stoop, reach, reach upward, handle, finger, feel, keyboard use, exposure to injury from biohazards, and exposure to weather; Frequent: lift/carry less than 10 pounds, sit, walk, adaption to change and travel." (Defs. 56.1 ⁋ 55; Pl. 56.1 ⁋ 59; AR 1280.) To prepare, Dr. Shepherd reviewed Plaintiff's "NaviLink File . . . which include[d] but [was] not limited to the office notes and documentation from [his] providers[,] . . . field services/vocational/clinical consultant, OSP activities in file, TPC's and diagnostics[, and] SSDI records." (AR 1281.) Dr. Shepherd's "full review of the medical record" included Nurse Ainscough's report but did not include an interview or exam of Plaintiff. (*Id.* 1282.)

Dr. Shepherd noted the following observations: (1) "12/16/15; 10/5/15; 4/22/14; 10/15/14 [Dr. Tartaglia] OVNs reflect that [Plaintiff] denies daytime somnolence and do not reflect that [Plaintiff] expresses concerns regarding fatigue or side effects from Metoprolol"; (2) "Although the 12/16/15 [Dr. Tartaglia] OVN reflect that [Plaintiff] report[ed] palpitations, he reports that the palpitations are fluttering that occurs several times a month lasting less than a minute without associated diaphoresis, dyspnea, syncope, chest pain. [Plaintiff] denies chest pain, edema, shortness of breath, dizziness, syncope. The reported palpitations would not be expected to preclude the outlined occupational demands"; (3) "12/10/15 [Dr. Fusco] OVN reflects that [Plaintiff] denies shortness of breath"; (4) "10/5/15 [Dr. Tartaglia] OVN reflects that [Plaintiff]

denies chest pain, pedal edema, shortness of breath, palpitations, chest pain, syncope, shortness of breath or edema"; (5) "9/28/15 [Dr. Fusco] OVN reflects that [Plaintiff] is in good spirits. Does not reflect palpitations, chest pain, syncope, shortness of breath or edema"; and (6) "Although the 4/22/15 [Dr. Tartaglia] OVN reflects shortness of breath at rest, [Plaintiff] denies chest pain, pedal edema, palpitations, dizziness and syncope. Further work up was not recommended. [Plaintiff's] symptoms are not on exertion," which reflected a change from December 1, 2010 when Plaintiff "complained of shortness of breath on exertion." (AR 1282.) Dr. Shepherd also considered discrepancies she identified between Plaintiff's reported condition and (a) Plaintiff's physical exam findings, (b) Plaintiff's activities (such as going to the gym daily for 45 minutes), (c) Plaintiff's diagnostic testing (including the October 2014 stress test and January 2016 Holter Monitor test), (d) Plaintiff's intensity management, (e) Plaintiff's improved depression, and (f) the stability of Plaintiff's other medical conditions. (AR 1282-83.)

Dr. Shepherd concluded that "the reported symptoms, physical exam findings, diagnostic testing, reported activities, and intensity of management reflected in the file do not support that [Plaintiff] would be precluded from performing the outlined occupational demands on a full time sustained basis." (*Id.* 1284.) Dr. Shepherd further determined "[t]here [was] adequate functional and exam information on which to base an assessment of functional capacity," such that "a hands on exam by an IME [was] not needed." (Defs. 56.1 ¶ 59; Pl. 56.1 ¶ 62; AR 1284.)

**F. First Unum Discontinues Plaintiff's Benefits After Designated Medical Official Review**

Because Dr. Shepherd disagreed with the opinions of Plaintiff's treating physicians, First Unum obtained a Designated Medical Officer ("DMO") review by George DiDonna, M.D. ("Dr. DiDonna"), a cardiologist. (Defs. 56.1 ¶ 60; Pl. 56.1 ¶ 63; AR 1286-88.) In performing his analysis, which included a review of "records, summaries, and opinions others ha[d] prepared," Dr. DiDonna observed, among other things, (1) "no deterioration in [Plaintiff's] cardiac condition

as manifested by his physical examinations and subsequent echocardiograms," and (2) that there had not been "frequent medication adjustments" for Plaintiff.  (Pl. 56.1 ⁋ 64; Defs. 56.1 ⁋ 62; AR 1287.)  Dr. DiDonna then noted that, while Plaintiff had "exercised to a level of five METS (sustained for brief periods)" on February 8, 2011, he attained "12.5 METs and 88% MPHR after 10min 30sec" during the October 21, 2014 stress test.  (Defs. 56.1 ⁋ 61; AR 1287.)  Dr. DiDonna determined these new results were "normal," even with "PVCs and one couplet."  (AR 1287.)

Dr. DiDonna determined that although Plaintiff "may have brief paroxysm of Atrial Fibrillation," it was "not impairing" given his "average heart rate on a recent 24 hour Holter Monitor [was] 72 bpm and there [were] no malignant arrhythmias."  (AR 1288.)  Dr. DiDonna conceded that Plaintiff "has a porcine bioprosthesis aortic valve," which can "degenerate over time at varying rates and may need future replacement."  (Defs. 56.1 ⁋ 64; Pl. 56.1 ⁋ 66; AR 1288.)  He nevertheless concluded that "[a]t this time, based on information on file, there is no medical evidence by echocardiograms or exercise testing to indicate that such deterioration has occurred to the point of impairing cardiac function."  (*Id.*)  The only restriction Dr. DiDonna detailed was that Plaintiff should avoid (1) "working at unprotected heights" and (2) "an occupation that would expose [him] to physical trauma due to the risk of bleeding."  (Defs. 56.1 ⁋ 65; AR 1288.)

On April 25, 2016, following Dr. DiDonna's review, First Unum determined that it would discontinue payment of Plaintiff's LTD Benefits.  (AR 1298.)  First Unum's letter explained that it had "determined [Plaintiff] [was] able to perform the duties of [his] regular occupation."  (*Id.* 1299.)  The letter then summarized the medical information from Plaintiff's claim file, as well as the related medical reviews and correspondence, that supported its decision.  (*Id.* 1299-1303.)

Of note, First Unum explained why Plaintiff could perform the duties of his regular occupation as defined by the Plan, notwithstanding his concerns:

Our Vocational Specialist clarified the physical demands of your regular occupation, as it is normally performed in the national economy. The level of functional capacity supported by our two physicians would allow you to perform your regular occupation of Director Security as it is performed in the national economy.

You have told us in numerous telephone conversations that you were an emergency medical technician as well. Additionally, you reported carrying a gun, patrolling campus, restraining people and keeping order.

Our Vocational Specialist noted that Security Director is a supervisory position and activities such as crowd control; patrolling campuses; and emergency technician would not necessarily be carried out by a Director of Campus Security. Your occupation in the national economy does not include emergency medical technician and crowd control as material and substantial occupational duties. These could be either voluntarily completed or a factor of the job or employer and are not representative of the occupations as performed in the national economy.

(*Id.* 1302.)

## G. Plaintiff's Appeals and First Unum Requests Additional Medical Review

On May 4, 2016, Plaintiff appealed First Unum's determination. (Defs. 56.1 ¶ 69; Pl. 56.1 ¶ 69; AR 1316.) By a letter dated May 11, 2016, First Unum requested that Plaintiff submit an "Authorization to Collect and Disclose Information" so that it could request additional information on appeal, if needed. (AR 1320.) First Unum followed up with that letter by calling Plaintiff's attorney, Warren Roth ("Roth") to determine "whether [Plaintiff] was planning on submitting additional information or rational [sic] for the appeal." (Defs. 56.1 ¶ 72; Pl. 56.1 ¶ 70; AR 1322.) Roth responded on May 19, 2016 by "enclosing a full and complete set of records of Dr. Joseph Tartaglia." (Defs. 56.1 ¶ 73; Pl. 56.1 ¶ 71; AR 1331-1584.) Roth later provided a full set of Dr. Fusco's records. (Defs. 56.1 ¶ 74; Pl. 56.1 ¶ 72; AR 1597-1755.)

Later, on June 21, 2016, Roth again wrote to First Unum indicating that he believed his "client is clearly disabled from his prior occupation" because "[h]e is no longer able to do the majority of the tasks that would be required of his job." (Defs. 56.1 ¶ 75; Pl. 56.1 ¶ 73; AR 1758.) Roth continued: "[Plaintiff] cannot be placed under stressful situations, he cannot restrain a

student, he cannot perform crowd control and he cannot run to the scene of an emergency. As such he cannot perform his duties." (*Id.*) Roth concluded that he "expect[ed] to produce in the near future one final medical report" to complete Plaintiff's appeal. (AR 1758.)

On August 2, 2016, Roth provided a letter from Dr. Tartaglia, dated July 27, 2016. (Defs. 56.1 ⁋ 78; Pl. 56.1 ⁋ 74; AR 1771.) Dr. Tartaglia's letter stated that although Plaintiff had a "good result" from his August 2010 aortic valve replacement "up until 2014," "his post-operative course has been complicated by paroxysmal atrial fibrillation intermittent but almost on a daily basis causing him disability and dizziness." (AR 1772.) For example, Plaintiff "ha[d] fainted from persistent atrial fibrillation May 2016 at White Plains Hospital." (Defs. 56.1 ⁋ 77; Pl. 56.1 ⁋ 74; AR 1772.) Plaintiff also had "complain[ed] of fatigue on exertion," which was "demonstrated on a recent nuclear stress test" that showed "chronic incompetence forcing the patient to abort the test early in stage II of the Bruce protocol due to failure to reach the target heart rate." (AR 1772.) Roth's August 2016 letter did not provide any of these medical records. (Defs. 56.1 ⁋⁋ 77-78.)

On August 19, 2016, First Unum obtained a peer review by Jonathan McAllister, M.D. ("Dr. McAllister"), board certified in internal medicine. (Defs. 56.1 ⁋ 77; Pl. 56.1 ⁋ 79.) Dr. McAllister considered the following three issues on appeal: (1) "Does the available information show there has been a significant improvement in [Plaintiff's] 'heart failure' and/or 'affective disorder', resulting in an improvement in his functional capacity, following his SSDI award on 03/25/11?"; (2) "Are [Plaintiff's] reports of functional loss consistent with the file information including clinical exams, diagnostic testing, treatment type and frequency and other file information as of 04/25/16?"; and (3) "Does the available medical evidence support [Plaintiff] is limited from exerting up to 20 pounds occasionally, walking and sitting frequently and standing, stooping, reaching handling, fingering and keyboarding beyond 04/25/16?" (AR 1786.) As part

of this review, Dr. McAllister summarized the relevant medical records, including those obtained on appeal. (Defs. 56.1 ¶ 80; AR 1787-88.) Dr. McAllister noted that the "majority of the records [submitted on appeal] were from 2015 and prior and were previously available for review."[18] (Defs. 56.1 ¶ 80; Pl. 56.1 ¶ 78; AR 1788.) He further considered the "Restrictions and Limitations" outlined by Dr. Tartaglia and Dr. Fusco and determined they were "Not Supported" by the record.[19] (AR 1789.)

Dr. McAllister concluded that Plaintiff's "condition had significantly improved since March 2011." (Defs. 56.1 ¶ 81; Pl. 56.1 ¶ 78; AR 1790.) Dr. McAllister drew this conclusion because Plaintiff "was only able to exercise to a level of 5 METS in February 2011 while [Plaintiff] was able to exercise to a level of 12.5 METS in October 2014," which reflected "significant overall improvement." (AR 1790.) Dr. McAllister next explained that "the records [did] not reflect the frequency/intensity of treatment or the expected abnormalities on examination/medical testing commensurate with [Plaintiff's] reported level of impairment as of 4/25/16." (Defs. 56.1 ¶ 82; AR 1790.) Finally, Dr. McAllister detailed his "medical opinion that the available medical records do not reflect [Plaintiff's] inability to perform full time work within the . . . occupational demands as of 4/225/16." (*Id.*)

---

[18]  Dr. McAllister specifically noted two medical records received on appeal: (1) Dr. Fusco's May 6, 2016 office visit note that indicated that Plaintiff reported "being anxious and having sleepless nights," as well as "chest tightness due to anxiety"; and (2) Plaintiff's January 5, 2016 Holter Monitor test that revealed (1) "predominately sinus rhythm with occasional narrow runs up to 13 beats at a rate of 150 beats per minute and (2) that Plaintiff "did not report symptoms during the monitoring period." (AR 1788; *see also* Pl. 56.1 ¶ 80.)

[19]  The Restrictions and Limitations included Dr. Tartaglia's Juley 27, 2016 letter, which Dr. McAllister summarized as follows: "AP letter explaining [Plaintiff's] disability regarding cardiac issues; PAF intermittent but on almost daily basis causing disability and dizziness; fatigue on exertion; recent nuclear stress test showed chronotropic incompetence forcing to abort test too early; medications also cause fatigue; incapable of any physical exertion or job requiring minimal physical exertion; standing > hour or sitting at a desk > 3 hours[]; anxiety and stress increase palpitations." (AR 1789.)

To support his conclusion, Dr. McAllister listed the following issues: (1) "October 2014 stress test noted that [Plaintiff] was able to exercise to 12.5 METS (approximately 5 METS sustained) which is well above the activity level needed to sustain full time work within the above noted occupational demands"; (2) "The . . . stress noted no evidence of sustained arrythmia even with maximum exercise"; (3) "The recent records do not reflect consistent complaints of shortness of breath, palpitations, weakness, fatigue, or dizziness"; (4) "The recent records do not reflect significant changes to the claimant's cardiac medications"; (5) "The recent records do not reflect emergency room or urgent care visits for cardiac complaints"; (6) "The recent records do not reflect physical exam findings of irregular heartbeat, gallops, rubs, edema, jugular venous distention, or other signs of cognitive heart failure"; (7) "The recent records do not reflect physical exam findings, imaging abnormalities, or symptoms consistent with prosthetic valve failure or dysfunction"; (8) "[Plaintiff] underwent a Holter monitor in early 2016 noting no sustained arrhythmia"; (9) "The records do not reflect recent signs or symptoms of CVA (stroke). (Patients with chronic atrial arrhythmias are prone to CVA)"; (10) "The most recent measure of ejection fraction was 50-55%. While this is the lower end of 'normal' this still falls within the normal range of systolic function"; and (11) "The medical records reflect activities inconsistent with the claimant's reported level of impairment. Examples include going to the gym for 45 minutes at a time, raking leaves, driving." (Defs. 56.1 ¶ 83; AR 1790.)[20]

In sum, Dr. McAllister determined that, "[c]onsidering [Plaintiff's] medical problems, together and separately, it [was] [his] medical opinion that the available information [did] not

---

[20]    Dr. McAllister also noted that Plaintiff's "recent record (May 2016) reflect[s] complaints of anxiety related to recent problems. However, the records do not consistently reflect complaints of anxiety or depression prior to this office note." (AR 1791.) Dr. McAllister went on to explain that Plaintiff had been prescribed Xanax for his anxiety during this May 2016 office visit, but "other than this, the records do not reflect aggressive management of psychotropic medications." (*Id.*) He further observed that the records did not reflect "ongoing treatment with psychiatry, psychology, or therapy," "emergency room or urgency care visits for depression or anxiety," or "consistent abnormalities on mental status examinations." (*Id.*)

reflect [Plaintiff's] inability to perform full time work *within the above noted occupational demands* as of 4/25/16 forward."  (AR 1791 (emphasis added).)

## H.  First Unum Affirms Its Decision

On September 15, 2016, First Unum "determined that the decision on [Plaintiff's] claims [was] correct," *i.e.*, that Plaintiff was "able to perform the material and substantial duties of his regular occupation and he no longer [met] the definitions of disability."  (AR 1799-1800; Defs. 56.1 ⁋ 86; Pl. 56.1 ⁋ 81.)  After detailing the medical information supporting its decision, First Unum addressed Plaintiff's assertion that he could not perform his job at Manhattanville:

> As outlined in the policy provisions . . . in order to be considered disabled and eligible to receive [LTD Benefits], or eligible for waiver of life insurance premiums, an insured must remain limited from performing the material and substantial duties of their regular occupation.
>
> Regular occupation means the occupation an insured is routinely performing when their disability begins.  Unum will look at the occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.
>
> This means an insured may have specific duties as part of their specific job, which are not considered [] material and substantial duties of their regular occupation as it is normally performed in the national economy.  The [Policy] does not insure an individual's ability to perform these job specific tasks . . . .

(AR 1801.)  First Unum then explained that Plaintiff's regular occupation, "Security Director," did not require the tasks, such as crowd control, EMT work, or patrolling campus, that Plaintiff claimed were duties of his job at Manhattanville.[21]  (Defs. 56.1 ⁋ 88; Pl. 56.1 ⁋ 83; AR 1801-02.)

Thereafter, First Unum provided examples of findings in Dr. Tartaglia's examinations from October 5, 2015, December 16, 2015, January 5, 2016, and Dr. Fusco's examination from May 6,

---

[21]     The letter outlined numerous tasks that "[t]he occupation of director of security, as it is normally performed in the national economy," could entail.  (*See* AR 1801-02.)  The letter also detailed the physical demands the role.  (*Id.* 1802.)

2016, which seemingly indicated that Plaintiff had greater functional capacity than either he or his doctors had contended. (Defs. 56.1 ¶ 91; AR 1803-04.) As the letter summarized, Plaintiff's:

> medical records [did] not document consistent symptoms of shortness of breath, palpitations, weakness, fatigue or dizziness. Additionally, his recent records [did] not show there has been a significant change to his cardiac medications or that he ha[d] required any recent urgent care or emergency department visits for acute cardiac symptoms.

> The most recent physical examinations [did] not document an irregular heartbeat, gallops, rubs, edema, jugular venous distention, or other signs of congestive heart failure. Additionally, his medical records [did] not reflect physical exam findings, imaging abnormalities, or symptoms consistent with a prosthetic valve failure or dysfunction.

(Defs. 56.1 ¶ 92; AR 1804.)[22] The letter concluded by reiterating First Unum's position that Plaintiff could perform the material and substantial duties of his regular occupation as it is performed in the national economy. (Defs. 56.1 ¶ 93; Pl. 56.1 ¶ 86; AR 1806.)

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment will not lie where there is a "dispute[] over facts that might affect the outcome of the suit under the governing law" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The Supreme Court has made clear that 'at the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter[.]'" *Westinghouse Elec. Corp. v. N.Y.C. Trans. Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). Rather, the relevant inquiry is "whether the evidence presents a sufficient

---

[22] The letter acknowledged that Plaintiff's position that he was "capable of only limited exercise and is not capable of any physical exertion" but concluded that "this appear[ed] inconsistent with [Plaintiff's] recent cardiac testing and Dr. Tartaglia's own medical records." (AR 1803.)

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Moreover, in deciding a motion for summary judgment, courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal citation and quotation marks omitted).

The moving party bears the initial burden of pointing to evidence in the record "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by showing "that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal citation and quotation marks omitted).

The party asserting that a material fact is genuinely disputed must support his or her assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). In addition, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

**I.       The Court Will Review First Unum's Denial of Benefits Under the Arbitrary and**

**Capricious Standard of Review**

Pursuant to ERISA, a person denied benefits under an employee benefits plan may bring a civil action "to recover benefits due to him [or her] under the terms of [the] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has held that courts must review a denial of plan benefits under a *de novo* standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-12, 115 (1989). In such cases, courts should apply the more deferential arbitrary and capricious standard of review. *Id.*

Here, neither party disputes that the Plan expressly grants First Unum exclusive discretionary authority and power to determine eligibility for benefits and to construe the terms and provisions of the Plan. (Defs. 56.1 ⁋ 2; Pl. 56.1 ⁋ 2; AR 78.) Hence, the arbitrary and capricious standard seemingly should apply. Plaintiff nevertheless contends that the Court should engage in a *de novo* renew because First Unum "failed to comply with the ERISA claims-procedure regulations a 29 C.F.R. § 2560.503-1." (Pl. Mem. of Law in Supp. of Cross Mot. for Summ. J. and Opp. to Defs. Mot. ("Pl. Mot."), ECF No. 51, at 2, 5.) Specifically, Plaintiff argues that First Unum did not consider Dr. Tartaglia's July 27, 2016 letter. (*Id.*) The Court disagrees.

As explained above, where a benefit plan grants the administrator or fiduciary discretionary authority, the arbitrary and capricious standard applies. *Firestone*, 489 U.S. at 115. However, if a plan administrator fails to comply with the Department of Labor's ("DOL") claim-procedure regulations, 29 C.F.R. § 2560.503-1, then courts will revert back to a *de novo* review of the claim denial "unless the plan has otherwise established procedures in full conformity with the regulations and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Halo v. Yale Health Plan, Dir. of Benefits &*

*Records Yale Univ.*, 819 F.3d 42, 57-58 (2d Cir. 2016). "[T]he plan 'bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it.'" *Id.* at 58 (quoting *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995)). Notwithstanding this framework, district courts that have considered the issue agree that a plaintiff must make the initial showing that a plan violated the DOL's regulations before shifting any burden onto the plan administrator. *See, e.g.*, *Capretta v. Prudential Ins. Co. of Am.*, No. 16 Civ. 1929(DAB), 2017 WL 4012058, at *6 (S.D.N.Y. Aug. 28, 2017) ("Here, Plaintiff neither makes a showing that Defendant failed to maintain a reasonable claims procedures nor alleges how Defendant's claims procedure—or its application thereof—might have violated the regulations. Because Plaintiff has failed to make such a minimal showing, Defendant will not be required to prove affirmatively its regulatory compliance."); *Donlick v. Std. Ins. Co.*, No. 3:16-CV-617 (FJS/DEP), 2017 WL 1683060, at *3 n.1 (N.D.N.Y. May 2, 2017) ("Rather, a fair reading of *Halo* requires only that the administrator show that it had discretionary authority to administer the plan; and its burden to prove compliance with DOL regulations arises, if it ever arises, only after a plaintiff makes a reasonable showing that the defendant violated DOL rules.").

As Plaintiff notes, under the applicable DOL regulations, First Unum must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." (Pl. Mot. 5 (quoting 29 C.F.R. § 2560.503-1(h)(2)(iv)).) Plaintiff thus posits that First Unum violated these regulations by failing to investigate, or ordering an independent medical examination related to, the information contained in Dr. Tartaglia's July 27, 2016 letter. (*Id.* at 5-6.)

Plaintiff has failed to meet his initial burden to establish a violation of the DOL regulations. Indeed, contrary to Plaintiff's assertion that First Unum failed to consider Dr. Tartaglia's letter, the record is clear that Dr. McAllister did acknowledge those findings during his review. (AR 1789.) Although the record establishes that First Unum did not take further action on the information contained in that letter, the DOL regulations do not impose that kind of requirement on plan administrators. *See* 29 C.F.R. § 2560.503-1(h)(2)(iv) (explaining that a full and fair review must "take into account all comments, documents, records, and other information *submitted by the claimant relating to the claim*" (emphasis added)). Whether First Unum should have investigated beyond the record can be relevant to whether it acted in an arbitrary and capricious manner. *See Latronica v. Local 1430 Int'l Bhd. of Elec. Workers Pension Fund*, 403 F. Supp. 3d 287, 307 (S.D.N.Y. 2019) (explaining that "where the record is underdeveloped, 'it may be arbitrary and capricious for the administrator [of a plan] to reject a claimant's evidence as inadequate without making a reasonable effort to develop the record further.'" (quoting *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 213 (2d Cir. 2015)). But the applicable regulations do not *mandate* that First Unum do so. As Plaintiff points to no other evidence in the record on this point, Plaintiff has failed to establish that First Unum did not comply with DOL regulations. The Court will proceed under an arbitrary and capricious standard of review.

## II.     First Unum's Denial of Benefits was Not Arbitrary and Capricious

The arbitrary and capricious standard is "highly deferential" and "the scope of judicial review is narrow." *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003). Under this deferential standard, "a court may not overturn the administrator's [decision] unless its actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *McCauley v. First Unum*

*Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)).  "Substantial evidence" has been defined as "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator"; it requires "more than a scintilla but less than a preponderance."  *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (quoting *Celardo*, 318 F.3d at 146).  Ultimately, the scope of review is "narrow"; courts are "not free to substitute [their] judgment for that of the insurer as if [] considering the issue of eligibility anew."  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83-84 (2d Cir. 2009) (quoting *Pagan*, 52 F.3d at 442 (alterations omitted)).

Here, the substantial, undisputed evidence in the record supports First Unum's decision. Specifically, the record reveals that several medical tests—which postdated First Unum's initial claim approval—indicated that Plaintiff's health conditions had improved, notwithstanding the persistence of his heart condition.  (AR 1133.)  The record further establishes, among other things, that Plaintiff had reported to his physicians, on multiple occasions, that he was engaged in regular exercise, and generally did not complain during those visits about issues such as chest pain, palpitations, or shortness of breath.  (*Id.* 1145, 1149.)  In total, First Unum tasked three doctors and a registered nurse to review this information.  Those reviewers weighed the medical evidence in Plaintiff's file and determined that, on balance, the medical record did not support Plaintiff's position that he continued to be disabled to the point of being unable to engage in light work.  (*Id.* 1194, 1218, 1284, 1288, 1790-91.)  First Unum then determined, based on this information, that Plaintiff was no longer disabled under the terms of the Policy and could return to work in his regular occupation (as that position would normally be performed in the national economy).

Notwithstanding the above, Plaintiff contends that First Unum's denial of Plaintiff's LTD Benefits was arbitrary and capricious for the following five reasons: (1) First Unum's investigation

came one month after it had approved the continuation of benefits; (2) the overwhelming medical evidence in the administrative record confirmed that Plaintiff was totally and permanently disabled; (3) it was improper not to request a physical examination; (4) First Unum failed to consider the impact of physical exertion on Plaintiff's ability to perform his job and unreasonably misclassified his occupation; and (5) First Unum's conflict of interest and history of biased claim administration warrants a finding that its decision was arbitrary and capricious. (Pl. Mot. 14, 16-25.) As explained below, none of these proffered challenges, even when considered together, disturb this Court's conclusion.

### A. Recertification of Plaintiff's Entitlement to Benefits One Month After Approving its Continuation

Plaintiff postulates that First Unum, "under the guise of a financial settlement, sought to conduct yet another recertification within one month of [Plaintiff's] most recent recertification approval." (Pl. Mot. 18.) Plaintiff further contends that "[t]here is no indication that such a change from a pre-existing condition review to a full-blown recertification review was warranted when the potential settlement was rejected." (*Id.*) In response, Defendants argue that Plaintiff "misstates the record," explaining that First Unum simply "determined that additional review was warranted as part of its settlement evaluation." (Defs. Reply 15.) Defendants maintain that their decision to undertake another review of Plaintiff's file pursuant to its settlement review was neither unreasonable nor improper. (*Id.* at 13.) The Court agrees.

To begin, as Defendants correctly note, the Plan allows First Unum to request proof of continuing disability from Plaintiff, without any limitation. (AR 73.) Moreover, there is "no rule in this Circuit against a Plan Administrator deciding, with or without new evidence, to revisit its decision to grant benefits." *Levitian v. Sun Life and Health Ins. Co.*, 486 F. App'x 136, 140 n.4 (2d Cir. 2012) (disagreeing with the district court's holding that "Sun Life's decision to reevaluate

Levitian's case was, *in and of itself*, 'unreasonable'" (emphasis in original)); *see also Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 363 (7th Cir. 2017) ("ERISA does not prohibit a plan administrator from performing a periodic review of a beneficiary's disability status."); *Ellis v. Liberty Life Assur. Co.*, 394 F.3d 262, 273-74 (5th Cir. 2004) (finding no authority "that would heighten the level of the proof needed for a plan fiduciary to determine entitlement or non-entitlement to LTD benefits simply because the fiduciary previously had approved entitlement and paid benefits"). Therefore, there is no facial indication that First Unum acted arbitrarily by requesting additional information from Plaintiff's disability, even if the request came shortly after it had approved the continuation of Plaintiff's benefits.

Nor does the conduct outlined in the record support such a conclusion. As previously outlined, First Unum decided to engage in a mortality review, which led to a determination that Plaintiff's pre-existing condition evaluation needed to be complete by DBS. (AR 1072.) DBS completed that pre-existing condition evaluation and, in turn, determined that an additional review was needed before making a settlement determination. (*Id.* at 1087.) Specifically, DBS concluded that it needed to confirm that Plaintiff was totally disabled and without any likelihood of change through the maximum duration of the Policy. (*Id.*) That review yielded the updated medical records and ultimately led First Unum to deny Plaintiff's claim.

There is no indication from the above evidence that "Defendants, under the guise of a financial settlement, sought to conduct yet another recertification." (Pl. Mot. 18.) To be sure, on October 5, 2015, First Unum's employee, Ronald Lowell, determined that "FSU" was "feasible per tool tier-3" but "not medically feasible at this time, First." (AR 1033.) Despite this assessment, First Unum decided to conduct a "mortality review" on October 22, 2015. (*Id.* 1035.) For their part, Defendants explain that this shift reflected a decision to "assess the possibility of a settlement"

given that the evidence "to date showed that plaintiff remained disabled." (Defs. Reply 14.) Despite Defendants explanation, the administrative record does not actually articulate First Unum's rationale for shifting its position. But the record is similarly devoid of any evidence that supports Plaintiff's theory that First Unum used financial settlement as a pretext to conduct another recertification. Nor has Plaintiff cited to any authority that prohibits a plan administrator from engaging in settlement review notwithstanding previous internal determinations. Accordingly, the Court concludes that First Unum's decision to reevaluate Plaintiff's LTD Benefits after its settlement review does not support a determination of arbitrary and capricious conduct.[23]

### B. Impact of Medical Evidence in the Record

Plaintiff maintains that the "overwhelming weight of evidence in the administrative record confirms that [he] [was] totally disabled, not only from his own occupation, but any occupation." (Pl. Mot. 19.) He argues, in turn, that First Unum disregarded "evidence confirming the existence and severity of [Plaintiff's] Medical Conditions, and instead, cherry-picked assorted snippets of information." (*Id.* at 20.) In response, Defendant points to several portions of the record that supported its physician reviewers' conclusion that Plaintiff's condition had improved by 2015 and 2016. (Defs. Reply 16; *see also* Defs. Mot. 21-22.) As noted above, the Court agrees.

It is true that the record had indicated that Plaintiff was disabled under the terms of the Plan when he initially applied for benefits. First Unum reviewed the medical information available at the time, credited it, and, in turn, approved Plaintiff's LTD Benefits claim. Thereafter, upon receipt of Plaintiff's updated medical records, First Unum obtained new information that revealed

---

[23]    Plaintiff further contends he was "not provided with any written notification after his completed October 2015 recertification that his claim was under review." (Pl. Mot. 18.) But, as Defendants retort, First Unum advised Plaintiff that it would "be obtaining updated records and disability opinion[s] from [his] doctors for a recertification review" during a November 2015 call. (AR 1090.) Plaintiff cites no authority specifying the particular manner a plan administrator must notify a claimant of an additional review or request for documents.

improvement in Plaintiff's condition.  It learned of the October 2014 stress test, which showed that Plaintiff (1) had achieved a peak METS of 12.5, an improvement from prior testing, and (2) was "negative for symptoms of coronary disease."  (AR 1131, 1133.)  It further learned of Plaintiff's January 2016 Holter Monitor test, which indicated that Plaintiff had not reported symptoms related to his heart condition during the monitoring period.  (*Id.* 1218.)

At the same time, First Unum discerned, through a review of Dr. Tartaglia's more recent office notes, that Plaintiff had reported that he was regularly exercising and going to the gym daily for 45 minutes and repeatedly denied "Chest Pain[,] Palpitations, Dizziness/Giddiness[, and] Syncope/Collapse," among other things.  (*Id.* 1145, 1149.)  This information was coupled with Dr. Tartaglia's representation to Dr. Shepherd that, although he did not agree that Plaintiff could perform the occupational demands of his job on a full-time basis, he did acknowledge that Plaintiff could perform sedentary work.  (*Id.* 1260.)  Dr. Tartaglia further represented that Plaintiff's October 2014 "stress test demonstrate[d] functional capacity," although "[he] [had] concerns that it [was] 2 years old" and may need to be repeated.  (*Id.*)

Finally, by the time Plaintiff appealed First Unum's initial determination, the only new me medical record available was Dr. Fusco's May 2016 office visit note that reported that Plaintiff was "anxious and having sleepless nights."  (*Id.* 1788.)  First Unum also obtained Dr. Tartaglia's July 27, 2016 letter explaining that Plaintiff "ha[d] fainted from persistent atrial fibrillation May 2016 at White Plains Hospital" (for which medical records were not provided).  (*Id.* 1772.)

As the administrative record establishes, each of First Unum's reviewers accounted for the totality of Plaintiff's medical information, including the above-noted evidence, rather than "cherry-pick[ing] assorted snippets of information" (Pl. Mot. 20).  Upon consideration of this information, each reviewer disagreed with Plaintiff's physicians' assessments that Plaintiff was unable to

engage light work.  Whether the Court agrees with the reviewers' conclusions or not, First Unum was entitled to credit their findings, which were based on the record before them, over the conclusions of Plaintiff's physicians.  *See Black & Decker*, 538 U.S. 822, 834 (2005) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); *see also See Kruk v. Metro. Life Ins. Co., Inc.*, 567 F. App'x 17, 20 (2d Cir. 2014) ("MetLife's choice to accord more weight to some expert opinions rather than others in differentiating between Kruk's mental and physical infirmities and determining the cause of her permanent disability was sufficiently within its discretion to preclude identification of arbitrary and capricious decision making."); *Tortora v. SBC Commc'ns, Inc.*, 446 F. App'x 335, 338-39 (2d Cir. 2011) (rejecting argument that defendants "failed to give adequate consideration to her treating physicians," where plaintiff submitted "additional medical evidence of a diagnosis of fibromyalgia" and defendants' additional reviewers "concluded that the medical evidence did not support [plaintiff's] claim"); *Couture v. Unum Provident Corp.*, 315 F. Supp. 2d 418, 432 (S.D.N.Y. 2004) ("Plaintiff's medical file contains multiple physician statements, employer letters and claimant reports regarding his condition and its progress over several years.  Defendants had several physicians and a vocational consultant all conduct complete medical reviews of plaintiff's file before rejecting his claim.  Moreover, plaintiff was given several opportunities to submit additional medical information, and was even informed what clinical tests would be useful.  He chose not to submit them.  Under the arbitrary and capricious standard of review, defendants had sufficient evidence to deny plaintiff continued long term disability payments.").  And in crediting those findings, First Unum had substantial support in the administrative record to determine that

Plaintiff was no longer disabled under the terms of the Plan.  In sum, Plaintiff's challenge premised on the weight of the medical evidence is unavailing for purposes of the Court's arbitrary and capricious review.

## C. First Unum's File Review

In addition to his contention that First Unum ignored overwhelming medical evidence, Plaintiff also faults First Unum for failing to conduct a physical examination of Plaintiff.  (Pl. Mot. 21.)  The Court finds no merit to this contention.

In general, "a plan sponsor is not required to conduct an in-person examination."  *Hafford v. Aetna life Ins. Co.*, No. 16-CV-4425 (VEC)(SN), 2017 WL 4083580, at *8 (S.D.N.Y. Sept. 13, 2017) (citing *Hobson*, 574 F.3d at 91).  Rather, a decision to order an independent medical examination is a decision that generally falls within the discretion of a plan administrator.  *See Hobson*, 574 F.3d at 91 ("Because this court only disturbs a plan administrator's determination if it is arbitrary and capricious, we are unconvinced that the Plan obliged MetLife to conduct an IME; rather, by not ordering such an examination, MetLife simply exercised its discretion to decline to pursue one option at its disposal.").  In this case, even acknowledging the medical facts detailed in Dr. Tartaglia's July 27, 2016 letter,[24] the administrative record (and, in particular, the objective medical evidence therein) does not support a conclusion that First Unum's decision to not pursue a physical examination of Plaintiff on appeal was arbitrary and capricious.  *See, e.g.*, *Topalian v.*

---

[24]     Plaintiff acknowledges that he did not submit any medical records to accompany Dr. Tartaglia's July 26, 2016 letter. (Pl. Mot. 23 n.2.)  He therefore asks the Court for an opportunity to supplement the administrative record with material that was not otherwise before First Unum when it rendered its decision on appeal.  (*Id.*) "[A] court's review of an ERISA claim under an arbitrary and capricious standard is generally limited to evidence in the administrative record[.]"  *Biomed Pharm. Inc. v. Oxford Health Plans (N.Y.), Inc.*, 831 F. Supp. 2d 651, 658 (S.D.N.Y. 2011).  However, the Second Circuit has "repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary, 'but which discretion ought not be exercised in the absence of good cause.'"  *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) (*quoting Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 289 (2d Cir. 2000)).  Here, Plaintiff offers no good cause to allow him to supplement the administrative record with extraneous materials.  Therefore, Plaintiff's request is denied.

*Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 358 (E.D.N.Y. 2013) ("plaintiff here has [] failed to adduce sufficient objective medical evidence proving that he continued to be disabled under the Plan. A personal examination of plaintiff was therefore unnecessary to establish what the preponderance of the medical evidence decisively proved: namely, plaintiff's ability to perform sedentary work notwithstanding his various medical conditions.").

The court's decision in *Diamond v. Reliance Std. Life Ins.*, 672 F. Supp. 2d 530 (2009)—a case upon which plaintiff chiefly relies—does not mandate a contrary conclusion. In *Diamond*, defendant had initially denied plaintiff's benefits on the grounds that she suffered from no physical impairments, and it relied on an independent medical evaluation to support its decision. *Id.* at 533, 537. After agreeing to a settlement wherein it would pay plaintiff's benefits without (purportedly) admitting there was disabled, defendant decided to conduct a review of plaintiff's file. *Id.* at 533. Upon that review, it concluded that plaintiff was not disabled and again denied her benefits. *Id.* Plaintiff appealed, citing various diseases with which she had been diagnosed and their impact on her ability to return to work. *Id.* at 534. Defendant, in turn, asked a doctor to engage in a medical file review, which concluded that there was "no evidence of physical injury that would limit" plaintiff and defendant upheld its decision. *Id.* The district court determined that defendant's conduct was arbitrary and capricious. *Id.* at 538. In so holding, the court considered the fact that (1) defendant chose not to order a new independent medical exam, despite the fact that three years had passed since the initial examination, and (2) it instead "relied on that [three-year old] evaluation and the review of plaintiff's medical records conducted in 2001 [the time of the initial claim denial]." *Id.* The district court further observed that the first time that defendant had reviewed plaintiff's *updated* medical records was during the file review on appeal. *Id.*

Critically, the key issue for the *Diamond* court was that defendant's review of plaintiff's medical record seemingly *ignored* the findings of plaintiff's physician, which was problematic given that "the chief symptoms of [plaintiff's] illness [were] subjective." *Id.* at 537. Similarly, the administrative record had indicated that defendant was primarily relying on outdated information before its request for a file review of plaintiff's updated records. *Id.* It was in that context that the court determined that defendant's failure to order an independent examination of the plaintiff rendered its claim denial "less credible." *Id.* at 538. And, importantly, defendant's decision not to order an examination was one of several factors the court weighed in concluding that the defendant's decision was arbitrary and capricious. *Id.*

Here, in contrast, First Unum's physician reviewers considered the totality of plaintiff's medical file, including updated information, and there is no indication, as previously explained, that they ignored plaintiff's physicians' conclusions. Moreover, although a physical examination may have been prudent, the administrative record nevertheless reveals sufficient objective medical evidence to support First Unum's physician reviewers' medical opinions. Because plaintiff has not "demonstrated that an [independent medical examination] was required to fairly evaluate his claim," the Court declines to conclude that First Unum's failure to request a physical examination amounts to arbitrary and capricious conduct. *See Rotondi v. Hartford Life and Accident Grp.*, No. 09 Civ. 6287(PGG), 2010 WL 3720830, at *11 (S.D.N.Y. Sept. 22, 2010) (rejecting plaintiffs' contention that defendant's failure to conduct an independent medical examination was arbitrary and capricious where defendant "in its discretion, decided that the medical evidence, including the reports and notes of [plaintiff's doctor] and the opinions of the two reviewing physicians along

with the videotaped surveillance footage of Plaintiff provided it with sufficient information to evaluate Plaintiff's LTD claim").[25]

### D. First Unum's Failure to Consider the Physical Exertion of Plaintiff's Job and its Purported Misclassification of Plaintiff's Occupation

Plaintiff challenges First Unum's decision to assign Plaintiff the job title of "Security Director" and disregard Plaintiff's employer-specific duties at Manhattanville. (Pl. Mot. 23.) Specifically, Plaintiff contends that First Unum "mischaracterize[ed] [] Plaintiff's occupation as a 'Security Director'" and "simply assumed [Plaintiff's] regular occupation" using his job title. (*Id.* at 24.) Defendants counter that First Unum determined Plaintiff's regular occupation (and, in turn, his disability) based on the Plan's definitions. (Defs. Reply 9.) Moreover, Defendants explain that First Unum's vocational assessment expressly considered Plaintiff's specific job duties when determining that Plaintiff's regular occupation, as it is normally performed in the national economy, was that of a "Security Director." (*Id.* at 10; Defs. Mot. 23-24.) Defendants therefore argue there is no merit to Plaintiff's position that First Unum's vocational assessment was arbitrary and capricious. (Defs. Reply 9-10.) The Court agrees.

If not defined in a plan, the applicable definition of "regular occupation" "shall be a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (quoting *Dawes v. First Unum Life Ins. Co.*, 851 F. Supp. 118, 122 (S.D.N.Y. 1994)). However, when a plan explicitly defines the term "regular occupation," that definition is what controls. *See Simone v. Prudential Ins. Co. of Am.*, No. 04 Civ.2076(DLC), 2005 WL 475406, at *7 (S.D.N.Y. Feb. 28, 2005) (explaining that plan's definition controlled

---

[25] To the extent Plaintiff premises his challenge on Nurse Ainscough's noting the need for an updated echocardiogram, the record indicates that, by February 2016, "additional diagnostics ha[d] since been received" by First Unum, thereby seemingly negating the need for those updated records. (AR 1239.)

where the plan stated that defendant "will look at [a claimant's] occupation as it is *normally performed instead of how the work tasks are performed for a specific employer or at a specific location* (emphasis in original). Here, the Plan plainly provides for a definition of "regular occupation." Thus, regardless of whatever interpretation of "regular occupation" Plaintiff may advocate (Pl. Mot. 23-24), it is the Plan's definition, and First Unum's interpretation thereof, that must control. *See DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp. 3d 458, 483 (S.D.N.Y. 2015) ("if both the claim administrator and claimant 'offer rational, though conflicting interpretations of plan provisions, the administrator's interpretation must be allowed to control.'"). For this reason, there is nothing amiss about how First Unum determined Plaintiff's "regular occupation" or analyzed the physical requirements of Plaintiff's "regular occupation" under the Plan.

As previously explained, the Plan defined the term disability as follows: "you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury."[26] (AR 82.) Central to that definition is the term "regular occupation," which the Plan defines as "the occupation you are routinely performing when your disability begins." (*Id.* 100.) The Plan further clarifies that, when assessing "regular occupation," "Unum will look at your occupation as it is normally performed in the national economy, *instead of how the work tasks are performed for specific employer or at a specific location.*" (*Id.* (emphasis added).) Therefore, although Plaintiff contends that First Unum failed to consider his duties at Manhattanville (Pl.

[26]     Plaintiff contends that Defendants should have assessed whether he could have achieved any "gainful occupation." (Pl. Mot. 24-25.) Plaintiff is correct that, at 24 months, First Unum was to look at whether Plaintiff was barred from *any* gainful occupation for which he was "reasonably fitted by education, training or experience." (AR 82.) But under the terms of the Plan, "gainful occupation" is defined more broadly as "an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds: 80% of your indexed monthly earnings, if you are working; or 60% of your indexed monthly earnings, if you are not working." (*Id.* 97.) Analyzing Plaintiff's entitlement to his benefits using the "regular occupation" definition therefore does not strike this Court as arbitrary and capricious, and Plaintiff cites no authority to the contrary. In any event, First Unum's assessment that Plaintiff could take on the duties of "Security Director" necessarily implies that he could have achieved gainful employment as defined by the Plan.

Mot. 23-24), the Plan expressly contemplated that First Unum's vocational assessment would be divorced of any employer-specific requirements.

The Plan's definitions are what Lobel, a vocational specialist, grappled with when he assessed Plaintiff's "regular occupation" in the national economy. (AR 465-71.) Lobel, in turn, used the job descriptions available on eDOT to find a job description consistent with the Plan's definitions. Under that framework, Lobel decided—based on the "similarity between [Plaintiff's] occupation description as described in the national economy and [Manhattanville's] job description—that "Security Director" was the closest occupation that matched Plaintiff's responsibilities at Manhattanville.[27] (*Id.*) Lobel then concluded that Plaintiff's job, *as it is performed in the national economy*, was a supervisory position requiring "Light Work" rather than the physical duties that Plaintiff maintained were central to his job at Manhattanville. (*Id.* 471.)

Overall, the above reveals that there is substantial evidence in the administrative record supporting First Unum's determination of Plaintiff's "regular occupation" and its subsequent assessments of Plaintiff's disability based on that definition.[28] To be sure, it "may have been preferable for [First Unum] to consider the descriptions" offered by Manhatanville when assessing the physical demands of Plaintiff's occupation. *DeCesare*, 95 F. Supp. 3d at 484. But, for purposes of this Court's review, "there was nothing arbitrary and capricious in using the DOT to evaluate [Plaintiff's occupation] in light of the Plan's definition" of regular occupation as it is

---

[27]    Lobel specifically noted that he considered other roles, such as "Director Student Union; Public Safety Officer; Security Technician; and Security Manager," but determined that "overall the similarities" of these occupations to Plaintiff's job duties were "not strong enough to have chosen" any of them as the "closest matching occupation." (AR 467.)

[28]    Plaintiff argues that First Unum "cherry-picked a job title that would allow [it] to terminate Plaintiff's long-erm benefits. (Pl. Mot. 24.) This contention is belied by the fact that First Unum initially approved, and continued to approve for several years after, Plaintiff's LTD Benefits while using that same definition. Moreover, to the extent Plaintiff challenges First Unum's decision not to inform Plaintiff of what "regular occupation" he was assigned when it initially approved his benefits, he points to no authority would support such a requirement upon the approval of a benefit. *Cf.* 29 C.F.R. § 2560.503-1(g).

performed in the national economy. *Id.* at 484-85. The vocational assessment accordingly does not impact the Court's view of First Unum's decision.

### E. First Unum's Conflict of Interest and Purported History of Bias

Plaintiff contends that Defendants are not owed "any deference" because of First Unum's "conflict of interest" and its "documented history of biased claims administration. (Pl. Mot. 14.) Defendants counter that "First Unum took a number of steps in administering plaintiff's claim that are recognized as reducing potential bias and promoting accuracy," such that any conflicts carry no weight in the arbitrary and capricious analysis. (Defs. Reply 19-20.) The Court agrees.

Even under the arbitrary and capricious standard, where a plan administrator has a conflict of interest because it "both evaluates claims for benefits and pays benefit claims," "courts must take [this conflict] into account and weigh [it] as a factor in determining whether there was an abuse of discretion[.]" *McCauley*, 551 F.3d at 132 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)). Such a conflict of interest may "act as a tiebreaker when the other factors are closely balanced," *Glenn*, 554 U.S. at 117, though its weight ultimately "depends on the circumstances." *Durakovic*, 609 F.3d at 140 (citation omitted). Specifically, the weight properly accorded to a conflict of interest depends on the "likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117. "Evidence that a conflict affected a decision may be categorical (such as 'a history of biased claims administration') or case specific (such as an administrator's deceptive or unreasonable conduct)[.]" *Durakovic*, 609 F.3d at 140.

Here, it is undisputed that a conflict of interest exists given that First Unum both determines benefit eligibility and pays out those benefits. (Pl. Mot. 14; Defs. Reply 19-20.) The question thus becomes what weight, if any, the Court should afford to this conflict when reviewing First Unum's

decision. As explained below, the Court concludes that the First Unum's conflict of interest has minimal bearing on the Court's arbitrary and capricious analysis.

To begin, Plaintiff primarily contends that First Unum's conflict of interest manifested in its "disregard[] of the facts in the administrative records that support[ed] the finding that [Plaintiff] was, and is disabled," and its "contradict[ion of] the only first-hand examinations Unum had on record." (Pl. Mot. 14.) However, the Court has already laid out why First Unum's conduct cannot be characterized as arbitrary or capricious. Thus, while conflict-of-inflict issues may exist where a plan administrator promotes the conclusions of its own reviewers and summarily discounts a claimant's evidence, *see Latronica*, 403 F. Supp. 3d at 302 (explaining that "the Fund's conflict of interest" would be "weighted accordingly" where, *inter alia*, "the Fund emphasized evidence favorable to its own position while dismissing summarily evidence contrary to its position; offered explanations that were inherently contradictory; and otherwise relied on weak evidence"), First Unum's decision-making process here does not implicate those concerns. *See VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 405 (S.D.N.Y. 2010) (explaining that defendant's conflict of interest, which "should be dispositive only as a 'tiebreaker,' [was] not "relevant when the conflicted party's conduct cannot otherwise be characterized as arbitrary or capricious"). In any event, Defendants note, and Plaintiff does not dispute, that First Unum "took a number of steps in administering plaintiff's claim that are recognized as reducing potential bias and promoting accuracy, including: assigning multiple individuals to review the claim; obtaining multiple medical reviews of the evidence; and contacting treating physicians to obtain medical information" to reduce any potential bias in the claim review process." (Defs. Reply 20.) Plainly, then, there is further support in the record that First Unum's existing structural conflicts did not meaningfully influence its decision on Plaintiff's claim. *See, e.g.*, *Hines v. First Unum Life Ins. Co.*, No. 14 Civ.

2961 (ER), 2016 WL 1246483, at *16 (S.D.N.Y. Mar. 23, 2016) (conflict of interest did not impact analysis where defendant argued, and plaintiff did not dispute, that "it took many steps 'that are well established' as serving to 'prevent[] the conflict from affecting the determination,' including 'assigning multiple individuals to review the claim,' 'obtaining multiple medical reviews of the evidence,' and 'contacting treating physicians to obtain additional medical information'").

First Unum's court-recognized history of bias, on which Plaintiff puts tremendous emphasis, does not alter this conclusion. As Plaintiff notes, in *McCauley*, the Second Circuit observed that First Unum had a "well-documented history of abusive tactics" and had drawn "biting criticism from judges." 551 F.3d at 137. Since *McCauley*, however, courts in this and other circuits have acknowledged that First Unum has improved its "claims-handling practices." *See, e.g.*, *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 514 (5th Cir. 2013); *Daniel v. UnumProvident Corp.*, No. CV-04-1073 (SJF), 2010 WL 8292157, at *15 n.10 (E.D.N.Y. Oct. 27, 2010) (explaining "the majority of courts that have reviewed determinations by UNUM Life to deny claims for benefits under ERISA plans since the Supreme Court targeted it in *Metropolitan Life* have upheld its determinations upon deferential review, notwithstanding the inherent conflict of interest and Unum's history of biased claims administration" (collecting cases)). And aside from invoking *McCauley*'s criticisms, Plaintiff does not point to any evidence—in the administrative record or elsewhere—that establishes that First Unum's history of bias has influenced its decision making in this case. *Cf. Correia v. Unum Life Ins. Co. of Am.*, No. 14 Civ. 7690 (KPF), 2016 WL 5462827, at *28 (S.D.N.Y. Sept. 29, 2016) (engaging in "more probing review of the record," given *McCauley*, where plaintiff "introduce[d] a number of exhibits concerning Unum's purportedly biased claims history and its incentive structure, in order to persuade th[e] [c]ourt that it should factor Unum's structural conflict of interest more heavily into

its evaluation of Unum's determination"). At bottom, then, First Unum's biased history, without more, is not enough to overturn the deference this Court must affforded to First Unum's decision. *See Rozek v. N.Y. Blood Ctr.*, 925 F. Supp. 2d 315, 341 (E.D.N.Y. 2013) ("[D]espite the Second Circuit's previous criticism of First Unum's claim determinations, where, as here, there is substantial evidence supporting First Unum's claim determination, courts have found that "these doubts are not enough to tip the balance of factors in favor of [a claimant]."); *Seaman v. Mem'l Sloan Kettering Cancer Ctr.*, No. 08 Civ. 3618(JGK), 2010 WL 785298, at *15 (S.D.N.Y. Mar. 9, 2010) (explaining "although mindful that the relationship between First Unum and Dr. Neuren has been viewed skeptically by some courts, and that other courts including the Court of Appeals for the Second Circuit have criticized First Unum's claim determinations," these "doubts [were] not enough to tip the balance of factors in favor of" plaintiff).

As Plaintiff has failed to establish how First Unum's structural conflict of interest impacted its claim review process, the Court concludes that First Unum's structural conflict of interest does not impact the substantial evidence supporting its decision.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 46 & 49 and enter judgment in favor of Defendants.

Dated: March 2ᵉ 2020
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge